**NO. 21-40470**

_____

**IN THE**
**UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

_____

**UNITED STATES OF AMERICA,**
**Plaintiff - Appellee**
**v.**
**SYLVIA P. ATKINSON,**
**Defendant - Appellant**

_____

**Appealed from the United States District Court**
**for the Southern District of Texas**
**Brownsville Division**
**No. 1:19-CR-01097**

_____

**BRIEF FOR APPELLANT**

_____

**Randy Schaffer**
**State Bar No. 17724500**
**Federal ID No. 950**
**noguilt@schafferfirm.com**

**Josh Schaffer**
**State Bar No. 24037439**
**Federal ID No. 33073**
**josh@joshschafferlaw.com**

**1021 Main, Suite 1440**
**Houston, Texas 77002**
**(713) 951-9555**
**(713) 951-9854 (facsimile)**

**Attorneys for Appellant**
**ORAL ARGUMENT REQUESTED**          **SYLVIA P. ATKINSON**

## **CERTIFICATE OF INTERESTED PERSON**

Counsel of record in United States v. Sylvia P. Atkinson, number 21-40470, certify that Sylvia P. Atkinson has an interest in the outcome of this case so the judges of this court may evaluate possible disqualification or recusal.

/s/ Randy Schaffer
Randy Schaffer

/s/ Josh Schaffer
Josh Schaffer

Attorneys for Appellant
SYLVIA P. ATKINSON

## **STATEMENT CONCERNING ORAL ARGUMENT**

Counsel believe that oral argument will assist the court in resolving whether the district court properly closed the courtroom to the public during the testimony of the undercover officer.

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTERESTED PERSON ................................................. i

STATEMENT CONCERNING ORAL ARGUMENT .................................... i

TABLE OF AUTHORITIES ........................................................................ vi

STATEMENT OF JURISDICTION................................................................ 1

STATEMENT OF THE ISSUES.................................................................... 1

STATEMENT OF THE CASE....................................................................... 3

    A.    Course Of Prior Proceedings......................................................... 3

    B.    Statement Of Facts ....................................................................... 3

        1.    The Indictment ................................................................... 3

        2.    The Government's Case-In-Chief....................................... 4

        3.    The Defense's Case............................................................ 12

        4.    The Government's Case-In-Rebuttal .................................. 15

        5.    The Arguments................................................................... 15

SUMMARY OF THE ARGUMENT .............................................................. 17

ARGUMENT ................................................................................................ 19

I.    THE EVIDENCE IS LEGALLY INSUFFICIENT TO SUSTAIN THE CONSPIRACY TO COMMIT BRIBERY CONVICTION BECAUSE APPELLANT CONSPIRED ONLY WITH A COOPERATING INDIVIDUAL AND AN UNDERCOVER OFFICER. ......................... 19

    A.    The Standard Of Review .............................................................. 19

**Page**

    B.    Appellant Conspired Only With A Confidential Informant And An Undercover Officer............................................................ 20

II.    THE EVIDENCE IS LEGALLY INSUFFICIENT TO SUSTAIN THE CONSPIRACY AND BRIBERY CONVICTIONS BECAUSE THE GOVERNMENT FAILED TO ESTABLISH A RELATIONSHIP BETWEEN THE FEDERAL PROGRAM THAT DISTRIBUTED THE FUNDS AND THEIR ULTIMATE USE BY THE SCHOOL DISTRICT THAT WOULD CONSTITUTE A "FEDERAL BENEFIT." ................................................................................ 25

    A.    The Standard Of Review .............................................. 25

    B.    There Was No "Federal Benefit" ................................. 25

III.    THE EVIDENCE IS LEGALLY INSUFFICIENT TO SUSTAIN THE BRIBERY CONVICTION BECAUSE A FICTITIOUS MOVIE PROJECT IN A GOVERNMENT STING OPERATION DOES NOT INVOLVE A "THING OF VALUE" OF $5,000 OR MORE. .............. 28

    A.    The Standard Of Review .............................................. 28

    B.    A Fictitious Movie Project Is Not A "Thing Of Value" .............. 28

IV.    THE EVIDENCE IS LEGALLY INSUFFICIENT TO SUSTAIN THE TRAVEL ACT CONVICTIONS BECAUSE THE PREDICATE OFFENSE, BRIBERY IN VIOLATION OF TEXAS LAW, DOES NOT QUALIFY AS "GENERIC AND CONTEMPORARY" BRIBERY. ................................................................................ 32

    A.    The Standard Of Review .............................................. 32

    B.    Bribery Under Texas Law Is Not "Generic And Contemporary" Bribery ........................................................ 32

**Page**

V. THE DISTRICT COURT DENIED APPELLANT HER SIXTH AMENDMENT RIGHT TO A PUBLIC TRIAL BY CLOSING THE COURTROOM DURING THE TESTIMONY OF AN UNDERCOVER OFFICER. .................................................. 36

    A.    The Standard Of Review ............................................. 36

    B.    The District Court Did Not Comply With The Rigorous Standard Set Forth In Waller v. Georgia, 467 U.S. 39 (1984), In Closing The Courtroom During The Undercover Officer's Testimony .... 36

    C.    The Sixth Amendment Violation Was Structural Error ............... 41

VI. THE DISTRICT COURT ABUSED ITS DISCRETION BY IMPOSING A TWO-LEVEL SENTENCING ENHANCEMENT FOR CRIMINAL ACTIVITY THAT INVOLVED MORE THAN ONE BRIBE ........................................................................... 42

    A.    The Standard Of Review ............................................. 42

    B.    The District Court Erred In Imposing An Enhancement Under U.S.S.G. § 2C1.1(b)(1) ................................................ 43

VII. THE DISTRICT COURT ABUSED ITS DISCRETION BY IMPOSING A FOUR-LEVEL SENTENCING ENHANCEMENT BASED ON APPELLANT BEING AN ORGANIZER OR LEADER OF CRIMINAL ACTIVITY THAT INVOLVED FIVE OR MORE PARTICIPANTS OR WAS OTHERWISE EXTENSIVE. ................... 45

    A.    The Standard Of Review ............................................. 45

    B.    The District Court Erred In Imposing An Enhancement Under U.S.S.G. § 3B1.1(a) ................................................... 45

**Page**

VIII.  THE DISTRICT COURT ABUSED ITS DISCRETION BY FAILING
       TO APPLY A THREE-LEVEL DOWNWARD ADJUSTMENT
       BECAUSE APPELLANT DID NOT COMMIT ALL THE ACTS
       NECESSARY FOR THE SUCCESSFUL COMPLETION OF ALL
       THE SUBSTANTIVE OFFENSES. ......................................................  48

       A.  The Standard Of Review ...............................................  48

       B.  The District Court Erred In Failing To Apply A Downward
           Adjustment Under U.S.S.G. § 2X1.1(b)(2)..................................  49

IX.    THE DISTRICT COURT ERRED IN DENYING APPELLANT'S
       MOTION FOR A DOWNWARD VARIANCE AT SENTENCING
       UNDER 18 U.S.C. § 3553(a). ......................................................  50

       A.  The Standard Of Review ...............................................  50

       B.  The District Court Erred In Denying Appellant's Motion For A
           Downward Variance Under 18 U.S.C. § 3553(a) .......................  51

CONCLUSION ....................................................................  54

CERTIFICATE OF SERVICE .........................................................  55

CERTIFICATE OF COMPLIANCE.......................................................  55

# TABLE OF AUTHORITIES

## Cases                                                                    Page

Adams v. Murphy, 653 F.2d 224 (5th Cir. 1981)...................................................  36

Arizona v. Fulminante, 499 U.S. 279 (1991) ...........................................  41, 42

Ayala v. Speckard, 131 F.3d 62 (2d Cir. 1997) (en banc) ...................................  40

Descamps v. United States, 570 U.S. 254 (2013) ..................................................  34

Fischer v. United States, 529 U.S. 667 (2000) .......................................  26, 27

In re Oliver, 333 U.S. 257 (1948).........................................................................  44

Jackson v. Virginia, 443 U.S. 307 (1979) ............................................  19-20

Judd v. Haley, 250 F.3d 1308 (11th Cir. 2001)......................................................  39

Mathis v. United States, 579 U.S. ____, 136 S.Ct. 2243 (2016) ..........................  35

McDonnell v. United States, 579 U.S. 550 (2016) ................................................  30

Neder v. United States, 527 U.S. 1 (1999) ............................................................  42

People v. Martinez, 624 N.E.2d 1027 (N.Y. 1993)................................................  40

Perrin v. United States, 444 U.S. 37 (1979) ..........................................................  33

Presley v. Georgia, 558 U.S. 209 (2010)................................................................  40

Press-Enterprise Company v. Superior Court of California, Riverside County,
        464 U.S. 501 (1980) ......................................................................................  38

Richmond Newspapers, Inc., v. Virginia, 448 U.S. 555 (1980) ...........................  39

Shepard v. United States, 544 U.S. 13 (2005).......................................................  34

Shular v. United States, 140 S.Ct. 779 (2020).......................................................  30

**Page**

Taylor v. United States, 495 U.S. 575 (1990) ........................................................ 33-34

United States v. Austin, 54 F.3d 394 (7th Cir. 1995)............................................ 47

United States v. Ayelotan, 917 F.3d 394 (5th Cir. 2019)...................................... 45

United States v. Bailey, 444 U.S. 394 (1980) ........................................................ 35

United States v. Bass, 404 U.S. 336 (1971) ............................................................ 30

United States v. Bravo-Fernandez, 913 F.3d 244 (1st Cir. 2019)........................ 26, 27

United States v. Brown, 186 F.3d 661 (5th Cir. 1999)........................................... 20

United States v. Candia, 454 F.3d 468 (5th Cir. 2006) ........................................ 51

United States v. Cervantes, 706 F.3d 603 (5th Cir. 2013) .................................... 36

United States v. Delgado, 984 F.3d 435 (5th Cir. 2021)....................................... 31, 52

United States v. Fernandez, 722 F.3d 1 (1st Cir. 2013) ........................................ 32

United States v. Ho, 311 F.3d 589 (5th Cir. 2002).................................................. 45, 46

United States v. Howell, 838 F.3d 489 (5th Cir. 2016)........................................... 35

United States v. John, 597 F.3d 263 (5th Cir. 2010), abrogated on other grounds
    by Van Buren v. United States, 141 S.Ct. 1648 (2021).............................. 50

United States v. Levy, 969 F.2d 136 (5th Cir. 1992) .............................................. 23

United States v. Manotas-Mejia, 824 F.2d 360 (5th Cir. 1987)............................ 20

United States v. Marmolejo, 89 F.3d 1185 (5th Cir. 1996)................................... 31

United States v. McLean, 802 F.3d 1228 (11th Cir. 2015) .................................... 27

United States v. Nikonova, 480 F.3d 371 (5th Cir. 2007)................................. 51, 54

**Page**

United States v. Osborne, 68 F3d 94 (5th Cir. 1995) ............................................. 39

United States v. Richard, 775 F.3d 287 (5th Cir. 2014) ......................................... 32

United States v. Rodriguez-Leos, 953 F.3d 320 (5th Cir. 2020) .......................... 50

United States v. Rojas Alvarez, 451 F.3d 320 (5th Cir. 2006) .............................. 24

United States v. Roussel, 705 F.3d 184 (5th Cir. 2013) ................................... 43, 44

United States v. Scott, 654 F.3d 552 (5th Cir. 2011) ............................................. 51

United States v. Smith, 739 F.3d 843 (5th Cir. 2014) ............................................ 20

United States v. Soto, 819 F.3d 213 (5th Cir. 2016) ........................................ 48, 50

United States v. Sun-Diamond Growers of California, 526 U.S. 398 (1999) ...... 33

United States v. Valdivia-Flores, 876 F.3d 1201 (9th Cir. 2017) ......................... 35

United States v. Waskom, 179 F.3d 303 (5th Cir. 1999) .................................. 48, 50

Waller v. Georgia, 467 U.S. 39 (1984) ................................................ 36, 39, 40, 42

Weaver v. Massachusetts, 137 S.Ct. 1899 (2017) ............................................ 39, 42

Zarate v. State, 551 S.W.3d 261 (Tex. App.—San Antonio 2018, pet. ref'd) ...... 34

## Constitutional Provision

U.S. CONST. amend. VI ................................................ 2, 18, 36, 38, 41, 42

## Federal Statutory Provisions

18 U.S.C. § 2 ...................................................................................................... 3

18 U.S.C. § 201(a)(3) ....................................................................................... 31

**Page**

18 U.S.C. § 371 ................................................................................ 3, 20

18 U.S.C. § 666(a)(1)(B) ........................................ 3, 25, 28, 29, 31

18 U.S.C. § 924(e)(2)(A)(i) ....................................................... 30

18 U.S.C. § 1952 ................................................................. 3, 32, 33

18 U.S.C. § 3553(a) ............................................ 2, 50, 51, 52, 54

18 U.S.C. § 3553(a)(2)(D) ........................................................ 52

18 U.S.C. § 3553(a)(3) ............................................................... 53

18 U.S.C. § 3553(a)(6) ............................................................... 53

28 U.S.C. § 1291 .......................................................................... 1

## Sentencing Guideline Provisions

U.S.S.G. § 2C1.1(b)(1) ........................................................ 43, 44

U.S.S.G. § 2C1.1(b)(3) ............................................................... 54

U.S.S.G. § 2X1.1(b)(2) ................................................... 48, 49, 50

U.S.S.G. § 2X1.1(b)(2), Cmt., n.4 ......................................... 49

U.S.S.G. § 3B1.1 ......................................................................... 47

U.S.S.G. § 3B1.1, Cmt., n.1 .................................................... 46

U.S.S.G. § 3B1.1, Cmt., n.2 .................................................... 47

U.S.S.G. § 3B1.1, Cmt., n.3 .................................................... 47

U.S.S.G. § 3B1.1, Cmt., n.4 .................................................... 47

**Page**

U.S.S.G. § 3B1.1(a) .......................................................................... 45, 46, 47

U.S.S.G. § 3B1.1(a), Cmt., n.1 ....................................................     46

U.S.S.G. § 3B1.1(c) ......................................................................   46, 48, 49

**Rule**

Fed. R. Evid. 404(b) ................................................................     21

**State Statutory Provision**

Tex. Penal Code § 36.02(a) (West 2020) ........................................... 33, 34

**Miscellaneous**

11 C.J.S. *Bribery* § 3 ...............................................................     33

## **STATEMENT OF JURISDICTION**

A jury convicted appellant of conspiracy, federal program bribery, and six counts of violating the Travel Act by using a facility in interstate commerce to promote bribery of a public official (ROA.252-59). The district court sentenced her to 80 months in prison for bribery and 60 months for the other offenses, fined her $35,000, and imposed three years of supervised release (ROA.350-56). This court has jurisdiction under 28 U.S.C. § 1291.

## **STATEMENT OF THE ISSUES**

1.   The evidence is legally insufficient to sustain the conviction for conspiracy to commit bribery because appellant conspired only with a cooperating individual and an undercover officer.

2.   The evidence is legally insufficient to sustain the convictions for conspiracy and bribery because the Government failed to establish a relationship between the federal program that distributed the funds and their ultimate use by BISD that would constitute a "federal benefit."

3.   The evidence is legally insufficient to sustain the bribery conviction because a fictitious movie project in a Government sting operation does not involve a "thing of value" of $5,000 or more.

4.    The evidence is legally insufficient to sustain the Travel Act convictions because Texas does not have a "generic and contemporary" bribery statute.

5.    The district court denied appellant her Sixth Amendment right to a public trial by closing the courtroom during the testimony of an undercover officer.

6.    The district court abused its discretion by imposing a two-level sentencing enhancement for criminal activity that involved more than one bribe.

7.    The district court abused its discretion by imposing a four-level sentencing enhancement based on appellant being an organizer or leader of criminal activity that involved five or more participants or was otherwise extensive.

8.    The district court abused its discretion by failing to apply a three-level downward adjustment because appellant did not commit all the acts necessary for the successful completion of all the substantive offenses.

9.    The district court erred in denying appellant's motion for a downward variance at sentencing under 18 U.S.C § 3553(a).

## STATEMENT OF THE CASE

### A.    Course Of Prior Proceedings

A jury convicted appellant of conspiracy to commit bribery in violation of 18 U.S.C. § 371; federal program bribery in violation of 18 U.S.C. §§ 666(a)(1)(B) and 2; and six counts of using a facility in interstate commerce to promote bribery of a public official in violation of 18 U.S.C. §§ 1952 and 2 (the Travel Act) (ROA.252-59).  The district court sentenced her to 80 months in prison for bribery and 60 months for the other offenses, fined her $35,000, and imposed three years of supervised release on May 26, 2021 (ROA.350-56).  Dale Robertson and Noe Garza represented her at trial.  Josh Schaffer represented her at sentencing.

### B.    Statement Of Facts

#### 1.    The Indictment

Count One of the superseding indictment alleged that appellant engaged in a conspiracy to commit bribery by using her positions as an official of the Brownsville Independent School District (BISD) and the Rio Hondo Independent School District (RHISD) and as an elected BISD trustee to extort money from a Cooperating Individual (CI), an Undercover officer (UC), and others to help obtain contracts relating to the school districts' purchases of computer tablets and other goods and services and for a "purported movie production project" (ROA.108-12).

Count Two alleged that appellant committed bribery as an agent of BISD,

which receives in any one-year period benefits in excess of $10,000 under a federal

assistance program, by soliciting and accepting anything of value from the UC and

others, intending to be influenced and rewarded in connection with any business

transaction of BISD involving any thing of value of $5,000 or more (ROA.112-13).

Counts Three through Eight alleged that appellant violated the Travel Act by

using facilities in interstate commerce six times to send text messages and make

phone calls to accomplish the bribery of a state public official (ROA.113-14).

## 2. The Government's Case-in-Chief

Rodrigo Moreno Fernandez, an illegal immigrant, provided campaign media

services for political candidates through his company, Pink Ape Media Consulting

(ROA.991-96, 1003-04). The FBI offered to protect him from deportation and help

him attain legal status in exchange for his cooperation with criminal investigations;

it paid him more than $40,000, including reimbursement of expenses (ROA.997,

1000-03).

Appellant invested $30,000 in a movie Moreno made in Brownsville called,

"The Whole" (ROA.1006-07). It appeared in film festivals and won some awards,

and appellant stood to make $250,000 if it could sell for $750,000 (ROA.1008-14).

Appellant contacted Moreno about Cesar Lopez's campaign in 2014

(ROA.1020-21). Lopez was on the BISD board of trustees from 2013-18 and was

board president from 2016-18 (ROA.1691-92). Appellant gave Moreno a corporate

check for $2,000 and told him to cash it and use it for advertising (ROA.1021-24, 1027). Moreno did not perform any work for the corporation (ROA.1029). He believed that candidates must pay vendors and that it violated state law not to report the contribution (ROA.1026). He notified the FBI (ROA.1037).

The FBI videotaped a meeting in Moreno's office with Lopez and appellant (ROA.1038). Appellant said that the money came from a man in Houston. Lopez asked how to report the contribution (ROA.1045). Appellant said that the check was made out to the company to pay for advertising so no one would know that the person contributed to Lopez and that he had a relationship with a vendor (ROA.1046-47). They wanted to hide the contribution from campaign finance reports (ROA.1048). Lopez denied knowing that it was illegal to accept a corporate contribution but admitted that he did not report the name properly (ROA.1714, 1726-27).

Moreno was involved with a bid at RHISD in 2015, when appellant was the assistant superintendent (ROA.1050). He met with appellant and Jaime Escobedo about the purchase of computer tablets for students (ROA.1051). Escobedo was not qualified for the contract and submitted the bid too late; but appellant intervened, and RHISD considered it (ROA.1052-53, 1074). Appellant then coached Escobedo how to win the contract (ROA.1056, 1090). She told Moreno that, if Escobedo won it, she knew at least four other school districts that would give him contracts (ROA.1071-72). She suggested that she would receive money from these contracts

(ROA.1072). She did not want to disclose her conflict of interest to the school board and did not want anyone to know that she discussed it with Moreno (ROA.1094-95, 1105). Moreno warned appellant that Escobedo was an "idiot" and could not present his bid in public (ROA.1113-14). Escobedo withdrew from consideration after Moreno criticized the presentation (ROA.1116-20, 1124). Appellant admitted that Escobedo had nothing to offer and could not handle the contract (ROA.1134-36).

Ismael Garcia, the former superintendent of RHISD, had worked with and was friends with appellant (ROA.1631, 1635-36). RHISD received more than $10,000 in federal funding in 2016 (ROA.1685). The bid to supply tablets from Escobedo's company, American Surveillance, should have been disqualified as untimely (ROA.1651). Someone convinced Garcia to accept a late bid (ROA.1664). It was "inappropriate" for appellant to coach a vendor how to present a bid to the board, to meet with a vendor before the board made a decision, and to provide pricing information (ROA.1658, 1665-66). She should have disclosed any conflict of interest if she knew a vendor or had an interest in the bid, and she should not have voted on it (ROA.1644-45). However, she did not try to influence Garcia's decision to purchase tablets from American Surveillance (ROA.1682).

Moreno provided consulting services for appellant's campaign for the BISD board of trustees in 2016 (ROA.1141). She said that Escobedo and Joe Salazar, another school district vendor, would pay for an opinion poll and needed an invoice

(ROA.1141-45). RHISD purchased 100 tablets and keyboard cases from American Surveillance for $24,500 in July of 2016 (ROA.1158-59). Moreno received a $3,000 check from American Surveillance for appellant's benefit seven days later (ROA.1160). Moreno believed that the money was a campaign contribution given directly to him that Escobedo and Salazar would deduct as a business expense (ROA.1151-52). The check purportedly was for a Power Point presentation, but Moreno did not perform that service (ROA.1153-55). The money really was a campaign contribution for a poll for appellant (ROA.1156-57).

The FBI told Moreno to schedule a meeting with appellant and an undercover officer (UC) posing as a movie producer from India who wanted to use Brownsville schools for a movie (ROA.1163, 2023). Appellant was interested if it would help sell "The Whole" (ROA.1167). They met at a restaurant in December of 2018 (ROA.1172-73, 2025-26). The UC wanted appellant's help filming a documentary on immigration in the school district (ROA.1176). Appellant said she would obtain quotes because it would not be free (ROA.1178). She implied that she, Moreno, and others would receive money (ROA.1180, 2051). The UC suggested that he would pay her to push the project, and she agreed to accept a bribe (ROA.2035-36, 2053).

The three met again the next day at Moreno's office (ROA.1180-81). The UC wanted to see if appellant would ask for money (ROA.1181, 2064). The UC and appellant met in one office while Moreno waited in another (ROA.1243). The UC

said that, as a board member, she controlled facilities that he wanted to use (ROA.1196). She said that he had her full support and that an item needed to be placed on the BISD agenda (ROA.1196-98). Moreno would be the front man for the project (ROA.1199-1200). Once approved, he would step aside, and the company would take control (ROA.1200). Moreno, as a local vendor, would pay less than an out-of-state vendor to use BISD facilities (ROA.1201-02, 2072-73). She said that the item would pass because she controlled a majority of the board (ROA.1207). Her services would cost "about 10," meaning $10,000, and she would have to share the money with others (ROA.1208-09, 2078-80). The UC would pay her $4,000 up front and $6,000 after the agenda item passed (ROA.1210-11). She accepted the terms, and the UC paid her $4,000 in Moreno's office (ROA.1211, 1243, 2079). The UC considered it to be a bribe (ROA.2051).

Appellant told Moreno to send a letter to the superintendent asking to use school facilities for the film (ROA.1258). The FBI told Moreno not to send the letter on time to see how appellant would react (ROA.1271). She was upset that they missed the deadline to place the item on the next agenda, which delayed her receipt of the other $6,000 (ROA.1270-71). She told him to send an email to the new superintendent and instructed him what to say (ROA.1291-92). She told him how to answer questions, and to lie, if asked by the board (ROA.1310-11).

Sylvia Hatton was the BISD interim superintendent in early 2019, and Patricia

Perez was the administrative assistant for the board (ROA.1938, 1992). Appellant pressured them to place the film project on the agenda for February 12, 2019 (ROA.1954-64, 1993-2000). Minerva Pena wanted to postpone consideration of the project until the March meeting (ROA.1973). Appellant argued with Pena, who agreed to keep it on the February agenda (ROA.1973-74). Hatton would not have placed the item on the agenda had she known that appellant received money to do so and would receive more money if it passed (ROA.1981-81). She agreed that the district would not have spent money on the project (ROA.1988).

Laura Perez Reyes served on the BISD board with appellant (ROA.1740). She had concerns when she saw the film project on the agenda (ROA.1749-51). She knew that appellant was partners with Moreno in Pink Ape and suspected that she was involved in the project (ROA.1751-53). Appellant advocated for it at the meeting and acted as if she did not write it (ROA.1765-70). Moreno attended the meeting; appellant spoke on behalf of the project; and it passed 7-0 (ROA.1313-14, 1774). Appellant told Moreno that she traded votes with Minerva Pena (ROA.1315-16). Perez would not have voted for the project had she known that appellant received money to draft the item and place it on the agenda and would receive more money if it passed (ROA.1774-77). However, appellant did not ask Perez to vote for the project (ROA.1802).

Phillip Cowen, an attorney and BISD board member, testified that BISD

received millions of federal dollars and more than $10,000 per year (ROA.1817-18). In his opinion, appellant committed official acts when she placed the film project on the board agenda and voted on it (ROA.1832-33). He also believed that appellant had a conflict of interest to receive money to place the item on the agenda, to advocate for it, and to receive money if it passed (ROA.1834-35). He would not have voted for the film project had he known about her conflicts (ROA.1835-36). He admitted that the board did not vote to award a contract to a vendor; it only approved the use of facilities for the film (ROA.1840-41).

Appellant met with the UC at Moreno's office the week after the vote (ROA.1318, 2096). The UC paid her the remaining $6,000 (ROA.1319, 2096-97). He considered it a kickback (ROA.2051). She said that she paid $2,000 to place the item on the agenda and ensure that it passed by guaranteeing that Pena would vote yes (ROA.1329-30, 2105-06). The UC said that he would put Moreno on salary to make the film appear to be a local effort (ROA.1331-32, 2107). Appellant wanted the UC and his friends in India to buy "The Whole" (ROA.1335, 2096). He offered to pitch it (ROA.1336, 2112). They discussed possible future bribes (ROA.1345-46, 2120). She said that she needed to have people elected in certain areas (ROA.1348, 2128). The UC said that he would pay off whomever was necessary (ROA.1350, 2132). Appellant agreed and assured him that what he needed done would be done (ROA.1351, 1354, 2129). She claimed to have connections to the

offices of Governor Greg Abbott and Senators Ted Cruz and John Cornyn (ROA.1360). The UC admitted that BISD did not pay him any money, and he never did any business with BISD (ROA.2477, 2481). He proposed paying appellant; she did not request money (ROA.2483-84).

Jeffrey Cottrill, a deputy commissioner with the Texas Education Agency, testified that local school districts receive federal funds through his agency (ROA.1844, 1848-49). BISD's annual budget is about $500,000,000 (ROA.1849). Of that, about $90,000,000 to $120,000,000 comes from federal funding (ROA.1849-50). RHISD's annual budget is about $20,000,000 (ROA.1850). Of that, about $3,000,000 comes from federal funding.

Joy Baskin, a lawyer for the Texas Association of School Boards, advises school districts (ROA.1873-76). Appellant received ethics training from her agency (ROA.1919-20). Board trustees do not receive compensation for their service (ROA.1879). A board can act on an item only if it appears on the agenda (ROA.1882). BISD policy requires two members to place an item on the agenda (ROA.1884). A request to place an item on the agenda, advocating for an item at a meeting, and voting for an item are all official acts by a trustee (ROA.1890-91). Board trustees should not negotiate with potential vendors (ROA.1899-1900). Accepting money for an official act violates BISD policy, as well as state law that a trustee cannot receive compensation for her role (ROA.45). Baskin believes that

such conduct also violates federal and state bribery statutes (ROA.1911-12). If a third person gives money for an official act but calls it a political contribution, it is still a bribe (ROA.1935).

FBI agent Michael Coblin interviewed appellant (ROA.2534, 2556). She admitted taking a bribe and knowing that it was wrong to accept money for her official position to place an item on the agenda and help it pass (ROA.2556-57, 2656-57). She understood the conflict-of-interest rules (ROA.2633). She admitted receiving benefits from her positions with RHISD and BISD to help companies with business (ROA.2634, 2638). She initially asserted that she could engage in that conduct as a community consultant but eventually admitted that she should have disclosed her conflicts of interest to BISD (ROA.2646-48). She deposited the $4,000 payment from the UC in an ATM and the other $6,000 in the bank (ROA.2596, 2627-28). She used a telephone to facilitate the acts alleged in Counts Three through Eight (ROA.2600-23).

### 3. The Defense's Case

Baltazar Salazar was general counsel for BISD (ROA.2896-97). Appellant asked him in December of 2018 if she would have a conflict of interest as a consultant for a company that was not a vendor with BISD (ROA.2898). He replied that she would have to disclose the relationship if her compensation exceeded ten percent of her gross income and that she could not discuss or vote on an item

involving the company (ROA.2898-99). The Pink Ape item on the agenda in February of 2019 would not cost BISD any money, and Pink Ape never submitted a contract for any work (ROA.2903-05). A trustee can advise a vendor about doing business with the district and can receive payment as a consultant but must file a conflict-of-interest disclosure if the vendor submits a contract (ROA.2905-07). Had appellant told Salazar that she received money to place the film project on the agenda, that she would receive payment if it passed, and that she would advocate for the project, he would have told her that she could not do that (ROA.2912-18).

Appellant testified in her defense (ROA.2935-3271). Equipped with a bachelor's degree, a master's degree, and a doctorate in education, she worked as a teacher, school administrator, school district administrator, superintendent, and consultant (ROA.2943-64). She met Moreno through political campaigns around 2011 (ROA.2965-66). She did not know that a corporation could not contribute to a political campaign; she did not tell Moreno to cash the check for Lopez's campaign; she did not receive any money for helping Moreno and Lopez; and Lopez was responsible for reporting his contributions (ROA.2971-85).

Moreno asked appellant to help him edit "The Whole" and to invest in it (ROA.2993). She invested $37,000 in the film in 2017 (ROA.2996-98).

RHISD needed tablets for students (ROA.3000). Appellant believed that she could negotiate quotes informally if the price was less than $50,000 (ROA.3001-02).

13

She did not serve on the committee that evaluated the bids (ROA.3003).  RHISD paid American Surveillance $24,500 for tablets, but she did not influence the decision or contract (ROA.3005-12).  Escobedo had the best product, service, and price for the job (ROA.3014).  She did not receive a benefit from the $3,000 that Escobedo and Salazar paid Pink Ape (ROA.3017).  Moreno conducted a poll for them; the money was not a campaign contribution for her (ROA.3020-23).  The money benefited only Moreno (ROA.3034).

Moreno contacted appellant about a new film project in December of 2018 (ROA.3035).  She agreed to meet without knowing what to expect (ROA.3042).  The UC said that he represented investors, so she thought they could buy "The Whole" (ROA. 3044-45).  When the UC discussed the film project, she believed that Moreno would be in charge (ROA.3048-50).  She explained her consulting services and expected they would have to pay for facilities (ROA.3052).  She agreed to help Moreno with the process and prepare the facilities request form (ROA.3053, 3059).  She quoted $10,000 for her services to help secure filming locations (ROA.3067).  She opposed postponing the vote to March but not because she wanted the $6,000 (ROA.3075-76).  She did not influence others to vote for the project (ROA.3077).

Appellant asked Salazar whether she could receive money to help place an item on the agenda (ROA.3086-87).  She said it was not a current vendor, did not involve a contract, and would not cost BISD any money (ROA.3090-93).  Salazar

did not advise her to abstain from voting (ROA.3094). She understood that she had to file a conflict-of-interest disclosure and abstain from voting only if the project involved a contract with BISD (ROA.3094-95). She admittedly violated district policies in failing to be transparent, but she did not believe that she violated the law (ROA.3097-98). She relied on Salazar's advice (ROA.3099).

Appellant told FBI agent Coblin that she violated BISD policies and practices (ROA.3114-15). She agreed to help the FBI with an investigation of a state court judge (ROA.3121-25).

Appellant agreed that helping to place an item on the agenda, advocating for it, and voting for it constitute official acts (ROA.3201-02).

### 4.    The Government's Case-In-Rebuttal

The Government presented testimony from three witnesses that appellant offered to help vendors with school district projects and advocated for vendors with school districts (ROA.3284-86, 3291-95, 3317-20).

### 5.    The Arguments

The Government argued that the jury needed to resolve whether appellant believed the money was a legitimate fee for services or a bribe (ROA.3459). Her lies after-the-fact indicated her guilty knowledge (ROA.3460). She convinced Hatton to place the film project on the agenda so there would be no public record that she was sponsoring the project (ROA.3461). She failed to provide all relevant

facts to Salazar when she asked him for advice, which shows her deliberate ignorance (ROA.3465-66). The value of the movie was more than $5,000 because it costs $5,000 to $10,000 per day to film, and no one would pay a $10,000 bribe for something worth less than that (ROA.3469-71). Thus, the amount of the bribe established the minimum value of the film project (ROA.3471).

The Government also argued that, to be convicted of conspiracy, appellant had to conspire with someone other than Moreno and the UC (ROA.3472). She conspired with Adela Garza and Escobedo and said that she had to pay others (ROA.3472-73). Her assertion that she was a consultant did not give her the right to accept a bribe (ROA.3498).

The defense argued that Moreno set up appellant to be charged with a crime so he could receive money from the FBI and avoid deportation (ROA.3476-78). Helping Lopez in 2014 was not part of a conspiracy, as the FBI instructed Moreno to cash the check and give Lopez the money; and it was Lopez's responsibility to report campaign contributions (ROA.3480-85). RHISD superintendent Garcia admitted that appellant did not influence the decision to award the tablets contract to American Surveillance (ROA.3486-89). The payment went to Moreno, and there was no evidence that appellant received a bribe (ROA.3487-91). As for the film project, she met with Moreno and the UC hoping to sell "The Whole" (ROA.3492). She sought advice from Salazar before moving forward, which shows a lack of

criminal intent (ROA.3494-95). She never would have deposited the money in the bank had she believed that the payments were bribes (ROA.3495). Her participation was based on the advice she received from Salazar, and she did not confess to any crime when she met with the FBI (ROA.3496-97).

## SUMMARY OF THE ARGUMENT

The evidence is legally insufficient to sustain the conviction for conspiracy to commit bribery because appellant conspired only with the CI and the UC. Her statement to the UC that the money was going to "some other people that I need to take care of" and that "two of this is going to [a] gentleman that made the donation for a HOPE thing" did not establish that she conspired with anyone else.

The evidence is legally insufficient to sustain the conspiracy and bribery convictions because the Government failed to establish a relationship between the federal program that distributed the funds and their ultimate use by BISD that would constitute a "federal benefit." The Government proved that BISD received federal funds but did not present evidence regarding the "structure, operation, and purpose" of the program to determine whether the funds qualified as a "federal benefit."

The evidence is legally insufficient to sustain the bribery conviction because a fictitious movie project in a Government sting operation does not involve a "thing of value" of $5,000 or more. The movie project, which was a figment of the imagination of Government agents, had no value.

The evidence is legally insufficient to sustain the Travel Act convictions because Texas does not have a "generic and contemporary" bribery statute. Federal law requires specific intent to commit bribery, not mere knowledge. Bribery under Texas law can be committed intentionally or knowingly. Thus, state law bribery does not qualify as a predicate offense for a Travel Act violation under the categorical approach, as intent and knowledge are alternative means of committing the state law offense.

The district court denied appellant her Sixth Amendment right to a public trial by closing the courtroom during the testimony of an undercover officer. Exclusion of the public was not necessary to protect the UC or ongoing or future investigations because he was from another locale, no one in Brownsville knew him, he did not disclose his name, and he wore a disguise.

The district court erred by imposing a two-level sentencing enhancement for criminal activity that involved more than one bribe. The Government proved only one bribe—the film project; the probation officer admittedly did not know the number of bribes involved; and the remaining attempted bribes were speculative and never came to fruition.

The district court erred by imposing a four-level sentencing enhancement based on appellant being an organizer or leader of criminal activity that involved five or more participants or was otherwise extensive. The UC and CI do not count

as participants; the Government argued only that appellant conspired with two other people; the court did not identify any participants; the Government failed to prove that any participants knowingly participated in criminal conduct; and appellant's activities were not organized or otherwise extensive.

The district court erred by failing to apply a three-level downward adjustment where appellant did not commit all the acts necessary for the successful completion of all the substantive offenses.  The court calculated the sentence based in part on money that appellant intended to but did not receive.  The court should have reduced the offense level because she failed to complete all the substantive offenses.

The district court erred in denying appellant's motion for a downward variance at sentencing.  The court failed to balance the statutory sentencing factors reasonably.  The sentence was substantively unreasonable, especially where it resulted in an unwarranted disparity among similar defendants.

## ARGUMENT

## I.     THE EVIDENCE IS LEGALLY INSUFFICIENT TO SUSTAIN THE CONVICTION FOR CONSPIRACY TO COMMIT BRIBERY BECAUSE APPELLANT CONSPIRED ONLY WITH A COOPERATING INDIVIDUAL AND AN UNDERCOVER OFFICER.

## A.     The Standard Of Review

The evidence is legally insufficient to sustain the conviction if it fails to establish each element of the offense beyond a reasonable doubt.     <u>Jackson v.</u>

_Virginia_, 443 U.S. 307, 316 (1979).  A reviewing court must consider the evidence in the light most favorable to the verdict and uphold the conviction if "a rational juror could have found each element of the offense beyond a reasonable doubt." _United States v. Brown_, 186 F.3d 661, 664 (5th Cir. 1999).  In determining whether the evidence is sufficient to sustain a conviction, the court must consider "the countervailing evidence as well as the evidence that supports the verdict."  _United States v. Smith_, 739 F.3d 843, 845 (5th Cir. 2014).  A conspiracy cannot exist between a defendant and a Government informant or agent.  _United States v. Manotas-Mejia_, 824 F.2d 360, 365 (5th Cir. 1987).

## B.    Appellant Conspired Only With A Confidential Informant And An Undercover Officer.

Count One alleged that appellant conspired to commit bribery in violation of 18 U.S.C. § 371 by using her positions as an official of BISD and RHISD and as an elected BISD trustee to extort money from the CI, the UC, and others for assistance in obtaining contracts relating to the school districts' purchases of computer tablets and other goods and services and for a "purported movie production project" (ROA.108-12).  Every overt act alleged in the indictment pertained to a fictitious movie project (ROA.110-12).  However, that "project" existed only in the imagination of government agents conducting a sting operation.

Rodrigo Moreno Fernandez was an illegal immigrant who feared deportation (ROA.991-95).  FBI agents said that, if he cooperated in criminal investigations, he

could remain in the United States to testify and then possibly obtain citizenship (ROA.997-1005). He became a CI to obtain legal status (ROA.998). He helped appellant disguise an illegal $2,000 campaign contribution to Cesar Lopez (ROA.1020-48) and obtain a contract for Jaime Escobedo to sell computer tablets to RHISD, where she was an assistant superintendent (ROA.1050-1160).[1]

The FBI instructed the UC to pretend to be a movie producer from India who was scouting locations to film a movie in Brownsville so they could determine whether appellant, a BISD trustee, would solicit a bribe from him (ROA.2023-24). Moreno arranged for the UC to meet appellant in December of 2018 (ROA.1163-64, 2023-24). Moreno believed that appellant would participate in a movie project, as she previously had invested $30,000 in a movie filmed in Brownsville, and he thought that she would try to persuade the UC to buy that movie for $750,000, to receive her share of $250,000 (ROA.1006-14, 1163-64, 1167).

The UC asked appellant to obtain BISD's consent to use its schools to film a documentary about immigration (ROA.1176). Appellant asked the UC for $10,000, asserting that the money was going to "some other people that I need to take care of" (ROA.1208-09). The UC gave her $4,000 to place the item on the agenda and agreed to give her $6,000 when it passed (ROA.1210-11, 2079). Ultimately, the

---

[1] The district court admitted testimony regarding these extraneous offenses under Rule of Evidence 404(b) (ROA.877-79).

item appeared on the agenda, appellant advocated for it, and it passed (ROA.1007, 1011-12). The UC paid appellant $6,000 in February of 2019 (ROA.1016-17, 2095-97). Appellant said that "two [thousand] of this is going to [a] gentleman that made the donation for a HOPE thing" (ROA.2105).

The Government recorded all of appellant's conversations with Moreno and the UC (ROA.2547). After her arrest, an FBI agent showed her videos of her meetings with Moreno and the UC, and she admitted that she knew that it was illegal to accept money to use her official position to place an item on the BISD agenda and help it pass (ROA.2556-57, 2656-57).

Appellant moved for a judgment of acquittal on the conspiracy count at the close of the Government's case-in-chief and renewed it at the close of all the evidence (ROA.2890, 3366-71, 3390-94). The district court, in denying the motion, commented, "I did find particularly substantial the argument concerning the requirement of the co-conspirator beyond . . . the Government agent or the informant. In the end, I do find that the few statements by [appellant], when viewed in the Government's favor for purposes of the motion, provide sufficient evidence from which a jury could render a verdict of … guilt. But . . . it was a . . . close call in that regard" (ROA.3394).

The district court instructed the jury in the charge that "[t]he conspiracy must include the Defendant and at least one other member who was, at the time, not a

Government agent or informant" (ROA.242).

A prosecutor argued during summation that appellant "said in the recordings that she **had used** some of her bribery – bribery money to pay off some other people. She couldn't keep it all, she had to pay others. Those 'others' who she's sharing her dirty money with, those are co-conspirators here" (ROA.3473) (emphasis added).[2]

Appellant did not tell Moreno that she had agreed to pay anyone in connection with the fictitious film project. Her statement that she was going to "take care of" others did not establish an existing conspiracy—a criminal "meeting of the minds"— with anyone else. <u>See</u> <u>United States v. Levy</u>, 969 F.2d 136, 141 (5th Cir. 1992) ("The essence of a conspiracy is a meeting of the minds—a shared criminal intent."). Rather than discussing what she had done in the past, she discussed what she intended to do in the future. The evidence was legally insufficient to establish that she conspired with anyone other than Moreno and the UC, as is required to sustain a conspiracy conviction.[3] The Government's theory that appellant conspired with

---

[2] The prosecutor's argument that appellant told Moreno that she **previously** had paid other persons was factually incorrect. In fact, she told the UC that there were "some other people that I **need** to take care of" (ROA.1208-09) (emphasis added).

[3] Moreno testified that appellant said that she used $2,000 of the $10,000 to obtain the vote of Minerva Pena, another BISD board member (ROA.1329-30):

Q. You . . . you had testified yesterday about her reference to paying other people; do you recall that testimony?

A. Yes, sir.

persons other than Moreno and the UC rests on speculation and conjecture, which cannot support a conviction. <u>United States v. Rojas Alvarez</u>, 451 F.3d 320, 333 (5th Cir. 2006) ("[A] verdict may not rest on mere suspicion, speculation, or conjecture, or on an overly attenuated piling of inference on inference.") (citations and internal quotation marks omitted). Appellant is entitled to a judgment of acquittal on the conspiracy count.

---

Q. Okay. So when the Defendant here says, "because we just had – we – we just – that – that morning in fact, two of this is going to the gentleman that made the donation for a hope thing," what is the Defendant referring to?

A. She's referring to a gentleman that got – got paid $2,000 because he was – he did – made a donation to miracle hope or hope – miracle – Mile of Hope, the association that it was associated with Minerva Pena.

Q. And so the reference of "two of this," what is the Defendant saying about two of what?

A. Two of the $10,000 that she received.

Q. She used to do what?

A. To place the item in the agenda and had it passed.

Q. In exchange for what?

A. For – for the vote for Minerva for passing this item also.

Q. Whether she knew the background or not?

A. Correct, yes.

This testimony did not establish that either the donor or Pena was aware of appellant's role in the fictitious film project or that she conspired with them to commit bribery.

## II.     THE EVIDENCE IS LEGALLY INSUFFICIENT TO SUSTAIN THE CONSPIRACY AND BRIBERY CONVICTIONS BECAUSE THE GOVERNMENT FAILED TO ESTABLISH A RELATIONSHIP BETWEEN THE FEDERAL PROGRAM THAT DISTRIBUTED THE FUNDS AND THEIR ULTIMATE USE BY THE SCHOOL DISTRICT THAT WOULD CONSTITUTE A "FEDERAL BENEFIT."

### A.     The Standard Of Review

Appellant discussed the applicable standard of review *supra* at pages 19-20.

### B.     There Was No "Federal Benefit."

Count Two alleged that appellant committed bribery in violation of 18 U.S.C. § 666(a)(1)(B) by soliciting a bribe as an agent of BISD, an organization and local government that, in any one-year period, receives "benefits in excess of $10,000 under a federal assistance program …" (ROA.112-13).

Phillip Cowen, a lawyer and BISD trustee, testified that BISD receives more than $10,000 of federal funding per year.  Some programs, such as "special ed," receive "millions of dollars every year."  Also, BISD receives between $30,000,000 and $40,000,000 of "bilingual funds" from the federal government (ROA.1817-20).

Jeffery Cottrill, the deputy commissioner of the Texas Education Agency, testified that the U.S. Department of Education provides federal funds to school districts through his agency (ROA.1844, 1848-49).  BISD's annual budget from 2014 to 2020 was about $500,000,000; it received about $30,000,000 to $40,000,000 in federal funds (ROA.1849-50).  RHISD's annual budget during this period of time

was about $20,000,000; it received about $3,000,000 in federal funds (ROA.1850).

The district court denied appellant's motion for judgment of acquittal on the bribery count at the conclusion of the Government's case-in-chief and at the close of all the evidence (ROA.2890, 3366-69, 3392-94).

The court instructed the jury in the charge that, to convict appellant of federal program bribery, it had to find that, in any one-year period, BISD received more than $10,000 in benefits from a federal program involving a grant, contract, subsidy, or other form of federal assistance and that the criminal conduct was connected to the local government that received the federal assistance (ROA.245-46).

The "jurisdictional element" of a § 666 prosecution requires the organization or local government to receive more than $10,000 in "benefits" from a federal program.  See United States v. Bravo-Fernandez, 913 F.3d 244, 247 (1st Cir. 2019). Not all federal funds constitute a "benefit" under the statute.  See Fischer v. United States, 529 U.S. 667, 681 (2000) ("Any receipt of federal funds can, at some level of generality, be characterized as a benefit.  The statute does not employ this broad, almost limitless use of the term.").  Only federal funds that "promote well-being," such as those that provide persons with "financial help in time of sickness, old age, or unemployment," may qualify as a "benefit" under the statute.  Id. at 677.  To determine whether an organization or local government participating in a federal assistance program received a "benefit," a court must examine the program's

"structure, operation, and purpose." Id. at 681. The evidence is legally insufficient if the Government proves only that the organization or local government received more than $10,000 in federal funds in any particular year without establishing a connection to an identifiable federal program that qualifies the funds as a "federal benefit" to satisfy the jurisdictional element of § 666. See United States v. McLean, 802 F.3d 1228, 1243 (11th Cir. 2015).

In McLean, the evidence was legally insufficient to establish the jurisdictional element of federal program bribery because the Government failed to prove a relationship between the federal program that authorized the distribution of the funds to the county and their ultimate use for bus shelters that were transferred to the organization. The funds were characterized generally as a "stimulus package" or "stimulus program." The Government did not present any testimony "identifying the relationship between the program authorizing a disbursement of federal funds and the ultimate use of those funds at the local level." 802 F.3d at 1244.

In Bravo-Fernandez, a businessman took a senator from Puerto Rico to Las Vegas, hoping that the senator would support pending legislation that would help his business. 913 F.3d at 246. Puerto Rico received more than $10,000 in federal funds that year. However, the Government failed to prove that those funds constituted a "federal benefit" to Puerto Rico absent testimony regarding "the intended or actual use" of any portion of those funds. Id. at 248, 251. The evidence was legally

insufficient to sustain the convictions of the businessman and senator for conspiracy and federal program bribery.

The Government presented testimony that BISD received more than $10,000 in federal funds for the years in question. However, other than Cowen mentioning that programs like "special ed" receive "millions of dollars every year" and that BISD received federal "bilingual funds" between $30,000,000 and $40,000,000, the Government did not present any evidence regarding the program's "structure, operation, and purpose" to establish that the funds qualified as a "federal benefit." The evidence was legally insufficient to establish the jurisdictional element of conspiracy and federal program bribery. Appellant is entitled to a judgment of acquittal on these counts.

## III. THE EVIDENCE IS LEGALLY INSUFFICIENT TO SUSTAIN THE BRIBERY CONVICTION BECAUSE A FICTITIOUS MOVIE PROJECT IN A GOVERNMENT STING OPERATION DOES NOT INVOLVE A "THING OF VALUE" OF $5,000 OR MORE.

### A. The Standard Of Review

Appellant discussed the applicable standard of review *supra* at pages 19-20.

### B. A Fictitious Movie Project Is Not A "Thing Of Value."

Count Two alleged that appellant violated 18 U.S.C. § 666(a)(1)(B) by soliciting and agreeing to accept anything of value from the UC and others, intending to be influenced and rewarded in connection with any business transaction and series

of transactions of BISD involving "any thing of value of $5,000 or more" (ROA.112-13).

Appellant solicited and accepted $10,000 to place the fictitious film project on the BISD agenda and help it pass (ROA.2078-79, 2095). The district court denied her motion for judgment of acquittal on the bribery count at the conclusion of the Government's case-in-chief and at the close of all the evidence (ROA.2890, 3366-69, 3392-94).[4]

The court instructed the jury in the charge that, to convict appellant of federal program bribery, it had to find that the business transactions involved "anything of value of $5,000 or more" (ROA.245).

A local government official commits bribery under 18 U.S.C. § 666(a)(1)(B) if she "corruptly solicits or demands for the benefit of any person, or accepts or agrees to accept, anything of value from any person, intending to be influenced or rewarded in connection with any business transaction, or series of transactions of such organization, government, or agency **involving any thing of value of $5,000 or more**" (emphasis added).

The Supreme Court interprets "involve" to mean "necessarily requir[e]" when determining whether a state drug offense "involve[es] manufacturing, distributing,

---

[4] The district court also denied appellant's motion to reconsider the order denying the motion for judgment of acquittal, which specifically raised this issue (ROA.295-98, 310).

or possessing with intent to manufacture or distribute a controlled substance" under 18 U.S.C. § 924(e)(2)(A)(i).  Shular v. United States, 140 S.Ct. 779, 785-86 (2020). The same interpretation should govern the meaning of "involving" in the bribery statute.  A fictitious film project does not "involve"—it does not "necessarily require"—a thing of value of $5,000 or more.[5]  An idea that exists in the imagination of government agents has no real monetary value.  Although appellant subjectively believed that the fictitious film project was worth $5,000 or more **to the UC**, that does not mean that it "necessarily require[d]" anything of value.  In reality, it had no value because it did not exist.

Because the statutory terms "involving" and "thing of value" are ambiguous, this Court must apply the rule of lenity to prevent § 666 from applying in an unconstitutional manner.  See United States v. Bass, 404 U.S. 336, 347 (1971) ("[A]mbiguity concerning the ambit of criminal statutes should be resolved in favor of lenity."); cf. McDonnell v. United States, 579 U.S. 550, 573 (2016) ("A related

---

[5] The UC, who pretended to be a movie producer, testified as follows:

Q. [defense counsel] . . .You were basically BS-ing each other because you did not have . . . a movie project, that was a lie, right?

A. For this scenario, yes.

Q. Right.  You didn't have all this money, that was a lie?

A. For this scenario, yes.

(ROA.2487-88).

concern is that, under the Government's interpretation, the term official act is not defined with sufficient definiteness that ordinary people can understand what conduct is prohibited, or in a manner that does not encourage arbitrary and discriminatory enforcement. . . .  Our more constrained interpretation of § 201(a)(3) avoids this vagueness shoal.") (citations and internal quotation marks omitted).  The ambiguity of these statutory terms inures to appellant's benefit.

This Court has held that one method of calculating the value of a bribery transaction is the amount that a person in the market is willing to pay for an intangible asset.  See United States v. Marmolejo, 89 F.3d 1185, 1194 (5th Cir. 1996). Sheriff Marmolejo accepted bribes to allow inmates to have conjugal visits in jail. The amount of the bribes established the jurisdictional element for sufficiency of the evidence purposes, as sex can be a "thing of value."  Id.  However, there is no rule that the amount of the bribe is "always dispositive of the value of a bribery transaction under § 666(a)(1)(B)."  United States v. Delgado, 984 F.3d 435, 447 (5th Cir. 2021) (release of lawyer's clients on bond after bribing judge was "thing of value" to clients sufficient to sustain bribery conviction).  Marmolejo and Delgado are distinguishable from appellant's case.  Conjugal visits and freedom are real, as their value is in the eye of the beholder.  Conversely, there was no film project—it was a figment of the imagination of government agents.  Although the bribe to appellant was $10,000, the fictitious film project that constituted the subject matter

of the bribe had no value.  See United States v. Fernandez, 722 F.3d 1, 12 (1st Cir. 2013).[6]  The evidence was legally insufficient to sustain the bribery conviction because the fictitious film project had no value, much less $5,000 or more.  Appellant is entitled to a judgment of acquittal on the bribery count.

## IV.  THE EVIDENCE IS LEGALLY INSUFFICIENT TO SUSTAIN THE TRAVEL ACT CONVICTIONS BECAUSE THE PREDICATE OFFENSE, BRIBERY IN VIOLATION OF TEXAS LAW, DOES NOT QUALIFY AS "GENERIC AND CONTEMPORARY" BRIBERY.

### A.  The Standard Of Review

Appellant discussed the applicable standard of review *supra* at pages 19-20.

### B.  Bribery Under Texas Law Is Not "Generic And Contemporary" Bribery.

Counts Three through Eight alleged that appellant violated 18 U.S.C. § 1952 (the Travel Act) by using facilities in interstate commerce six times to send text messages and emails and make phone calls to accomplish the bribery of a state public official (ROA.113-14).

Appellant used her phone to send text messages and emails and make calls to arrange to place the fictitious film project on the BISD agenda (ROA.2600-01, 2605-10, 2620-23).  A prosecutor acknowledged during closing arguments that the bribery and Travel Act counts concerned only the film project (ROA.3499).

---

[6] In United States v. Richard, 775 F.3d 287, 294 n.1 (5th Cir. 2014), the appellant made this argument during oral argument but not in the brief, so this Court did not address it.

The district court denied appellant's motion for judgment of acquittal on the Travel Act counts at the close of the Government's case-in-chief and the close of all the evidence (ROA.2890, 3366-71, 3392).

18 U.S.C. § 1952 prohibits persons from using telephones and the internet to engage in unlawful activity. Counts Three through Eight alleged Travel Act violations predicated on bribery as defined by § 36.02(a) of the Texas Penal Code. A state law bribery statute can qualify as a predicate offense for a Travel Act violation if it constitutes "generic and contemporary" bribery. See Perrin v. United States, 444 U.S. 37, 48-49 (1979). "Generic and contemporary" bribery requires a "specific intent" *mens rea*. See United States v. Sun-Diamond Growers of California, 526 U.S. 398, 404-05 (1999) ("[F]or bribery there must be a *quid pro quo*—a specific intent to give or receive something of value in *exchange* for an official act."); 11 C.J.S. *Bribery* § 3 ("Bribery involves a payment designed to alter the outcome of any matter that could conceivably come before the official and generally, the elements of the crime of bribery are the offering of a sum of money or other thing of value to a public officer or employee **with a corrupt intent** to influence the recipient's official action.") (citing statutes from various states; emphasis added).

A court must apply the categorical approach in deciding whether a state statute qualifies as a predicate offense under the Travel Act. See Taylor v. United States,

495 U.S. 575, 600-02 (1990); Shepard v. United States, 544 U.S. 13, 17 (2005).  The

court "may look only to the statutory definitions—*i.e.*, the elements—of [the state

law] offenses, and not to the particular facts underlying [the defendant's conduct that

allegedly violated the state statute].  If the relevant statute has the same elements as

the 'generic' . . . crime, then the [state law offense] can serve as [a] predicate . . . .

But if the statute sweeps more broadly than the generic crime, . . . that law cannot

count as [a] predicate, even if the defendant actually committed the offense in its

generic form.  The key . . . is elements, not facts."  Descamps v. United States, 570

U.S. 254, 261 (2013) (citations and internal quotation marks omitted).

Taylor, the leading categorical approach case, cited Perrin, which held that

only "generic and contemporary" bribery qualifies as a predicate offense under the

Travel Act.  Taylor, 495 U.S. at 598.  Significantly, § 36.02(a) of the Texas Penal

Code has alternative culpable mental states of "intentionally" or "knowingly."  ("A

person commits an offense if he intentionally **or** knowingly offers, confers, or agrees

to confer on another, or solicits, accepts, or agrees to accept from another… any

benefit as consideration for the recipient's decision, opinion, recommendation, vote,

or other exercise of discretion as a public servant.") (emphasis added); see also

Zarate v. State, 551 S.W.3d 261, 268 (Tex. App.—San Antonio 2018, pet. ref'd)

(discussing alternative *mens rea* requirements in Texas bribery statute).  Section

36.02(a) does not constitute "generic and contemporary" bribery because it does not

require a specific intent *mens rea*, as mere knowledge is sufficient.  Specific intent

is a higher *mens rea* than knowledge, as one can act knowingly without having a

specific intent.  See, e.g. United States v. Valdivia-Flores, 876 F.3d 1201, 1207 (9th

Cir. 2017) ("Consistent with the Model Penal Code on which it is based,

Washington's criminal law expressly codifies the distinction between intent and

knowledge and makes plain that knowledge is a less demanding *mens rea*

requirement. . . . The same distinction exists in federal law."); United States v.

Bailey, 444 U.S. 394, 405 (1980) (recognizing distinction between intent and

knowledge under federal law).  Under the categorical approach, when a state statute

authorizes a conviction based on an "intentional" or "knowing" *mens rea*, but the

"generic and contemporary" offense requires specific intent, the state statute does

not qualify as a predicate offense for a Travel Act violation.  Even a minor difference

in the *mens rea* required disqualifies a state statute as a predicate offense under the

categorical approach.  See Mathis v. United States, 579 U.S. ___, 136 S.Ct. 2243,

2253 n.3 (2016).

Federal law requires specific intent to commit bribery, not mere knowledge.

Texas law allows intent **or** knowledge to commit bribery.  Thus, bribery under Texas

law does not qualify as a predicate offense for a Travel Act violation under the

categorical approach.  Cf. United States v. Howell, 838 F.3d 489, 498-99 (5th Cir.

2016) (*mens rea* of intentionally, knowingly, or recklessly "means that the offense

for which Howell was convicted is not divisible on the basis of a defendant's mental state. . . .  Accordingly, the modified categorical approach cannot be employed to 'narrow' the statute of conviction.").

The evidence was legally insufficient to support the Travel Act convictions because Texas does not have a "generic and contemporary" bribery statute. Appellant was convicted of nonexistent Travel Act violations under federal law. See Adams v. Murphy, 653 F.2d 224, 225 (5th Cir. 1981) ("Nowhere in this country can any man be condemned for a nonexistent crime.").  She is entitled to a judgment of acquittal on the Travel Act counts.

## V.    THE DISTRICT COURT DENIED APPELLANT HER SIXTH AMENDMENT RIGHT TO A PUBLIC TRIAL BY CLOSING THE COURTROOM DURING THE TESTIMONY OF AN UNDERCOVER OFFICER.

## A.    The Standard Of Review

This Court reviews a timely objection to the district court's closure of the courtroom to the public de novo.  See United States v. Cervantes, 706 F.3d 603, 611-12 (5th Cir. 2013).

## B.    The District Court Did Not Comply With The Rigorous Standard Set Forth In Waller v. Georgia, 467 U.S. 39 (1984), In Closing The Courtroom During The Undercover Officer's Testimony.

The Government filed a sealed motion for a protective order to allow the UC to testify in disguise without disclosing his name in a courtroom closed to the public (ROA.5480-98).  Importantly, the Government conceded that "the UC will be called

to introduce the recordings and text messages of the UC's conversations with [appellant]"; that the UC "had no conversations with [appellant] that were not recorded by audio/video or text message"; and, that the UC is "not an essential witness to the substance of the incriminating statements and actions of [appellant] [as] the tapes speak for themselves. In other words, the credibility of the UC is minimally at issue in this line of testimony" (ROA.5486-87).

Appellant opposed the motion because excluding the public from the courtroom "is not the least restrictive means for achieving the Government's purpose" (ROA.5658). She emphasized that closing the courtroom during the UC's testimony would convey to the jury that she is dangerous (ROA.5661).

Appellant objected at a pretrial hearing to excluding the public from the courtroom during the UC's testimony at trial. The Government refused to disclose the UC's name because he is involved in national security investigations infiltrating terrorist organizations (ROA.378-80). Several months later, the court ruled that disclosure of the UC's name would create a substantial risk of danger to him and his family and would jeopardize ongoing and future investigations; that he could testify in disguise (for example, by altering his hairstyle, facial hair, and manner of dress); and that the courtroom would be closed to the public when he testifies, but a livestream audio would be available in another courtroom (ROA.446-49).

Appellant renewed her objections outside the presence of the jury before the

UC testified at trial (ROA.2017-20).  The district court made the same rulings and announced that it had closed the gallery, but the public could listen to the testimony in another courtroom (ROA.2018).  The court instructed the jury over appellant's objection that it had closed the courtroom to allow the UC to testify without disclosing his name to protect his identity regarding ongoing and future investigations (ROA.2020-21).

The UC testified to the events depicted in the videos (ROA.2021-2136).  Agent Coblin testified that the FBI used an undercover officer from another locale, rather than a local law enforcement officer, because Brownsville is "a small community, everybody knows everybody, so … for the safety of the UC, you don't want to insert a local into a local operation" (ROA.2578-79).

The Sixth Amendment guarantees the defendant a public trial in a criminal case.  "The requirement of a public trial is for the benefit of the accused; that the public may see he is fairly dealt with and not unjustly condemned, and that the presence of interested spectators may keep his triers keenly alive to a sense of their responsibility and to the importance of their functions . . . ."  In re Oliver, 333 U.S. 257, 270, n.25 (1948).  The Supreme Court elaborated on the importance of allowing the public to view the proceedings in Press-Enterprise Company v. Superior Court of California, Riverside County, 464 U.S. 501, 508 (1980):

> The value of openness lies in the fact that people not
> actually attending trials can have confidence that standards

> of fairness are being observed; the sure knowledge that
> *anyone* is free to attend gives assurance that established
> procedures are being followed and that deviations will
> become known. Openness thus enhances both the basic
> fairness of the criminal trial and the appearance of fairness
> so essential to public confidence in the system. (citing
> <u>Richmond Newspapers, Inc. v. Virginia</u>, 448 U.S. 555,
> 569-71 (1980)).

The right to a public trial protects not only the accused but also the public and the

press. <u>Weaver v. Massachusetts</u>, 137 S.Ct. 1899, 1910 (2017).

The district court closed the courtroom and barred the public from observing

the UC testify at trial. The exclusion of all members of the public from the

courtroom during the testimony of a witness constitutes a total closure as opposed

to a partial closure, in which some members are excluded but others are allowed to

remain. <u>See United States v. Osborne</u>, 68 F.3d 94, 98 (5th Cir. 1995). A "total

closure of the courtroom, even for a temporary period, eliminates for a time the

valuable role the presence of spectators can have on the performance of witnesses

and court officials, and can create a public perception that the defendant is not being

treated justly." <u>Judd v. Haley</u>, 250 F.3d 1308, 1315-16 (11th Cir. 2001).

A total closure of the courtroom is subject to the four-prong test established

in <u>Waller v. Georgia</u>, 467 U.S. 39, 48 (1984). <u>Judd</u>, 250 F.3d at 1316. The party

seeking the closure "must advance an overriding interest that is likely to be

prejudiced, the closure must be no broader than necessary to protect that interest, the

trial court must consider reasonable alternatives to closing the proceeding, and it

must make findings adequate to support the closure." <u>Waller</u>, 467 U.S. at 48.

The Supreme Court has held that closing the courtroom during a pretrial suppression hearing or the voir dire examination denies the defendant a public trial. <u>Waller</u>, 467 U.S. at 48; <u>Presley v. Georgia</u>, 558 U.S. 209, 215-16 (2010).  It has never upheld a total closure of the courtroom during testimony at a criminal trial.

The *en banc* Second Circuit has referred to the <u>Waller</u> test as "rigorous."  <u>See</u> <u>Ayala v. Speckard</u>, 131 F.3d 62, 69 (2d Cir. 1997) (en banc).  It upheld the closure of the courtroom during the testimony of an undercover officer in **that** drug case because the district court carefully considered and reasonably applied all four prongs. <u>Id.</u> at 69-73.  Of particular relevance to appellant's case, the closure in <u>Ayala</u> was justified because the officer remained involved in undercover investigations in the community where the court was located, and his life would be in danger if his identity were known.  <u>Id.</u> at 64, 72.  <u>But see</u> <u>People v. Martinez</u>, 624 N.E.2d 1027, 1031-32 (N.Y. 1993) (undercover officer's continuing investigations in area and dangers of undercover work in general did not justify closure of courtroom).

Appellant's case is distinguishable from <u>Ayala</u>.  Appellant was a school board trustee, not a terrorist, drug dealer, mobster, or gang leader.  More importantly, closing the courtroom was unnecessary to protect the UC or other investigations because he was from another locale, no one in Brownsville knew him, he did not disclose his name, and he wore a disguise.  The Government admitted before trial

that he would testify only to predicate the video recordings and text messages—which it could have accomplished through a stipulation without his testimony—and that his credibility would not be an issue.  Closing the courtroom—which the court emphasized by giving a contemporaneous jury instruction over objection—improperly suggested that the public's presence would jeopardize the UC's safety and other investigations.  The Government did not advance an overriding interest that was likely to be prejudiced by allowing the public to remain in the courtroom—especially where the Government did not consider an alternative to calling the UC to testify.  Excluding the public from the courtroom denied appellant her Sixth Amendment right to a public trial.

This is an important issue with widespread implications in criminal cases in this circuit.  If this Court upholds the district court's ruling, its opinion will be cited in an attempt to exclude the public from the courtroom in every federal and state trial in which an undercover officer testifies.  The rights of the accused to a public trial, not to mention a fair one, are gravely at risk.

## C.    The Sixth Amendment Violation Was Structural Error.

The Supreme Court divides constitutional errors into two categories.  <u>See</u> <u>Arizona v. Fulminante</u>, 499 U.S. 279, 307-10 (1991).  "Trial errors" occur during presentation of the case to the jury; their effect "may be quantitatively assessed in the context of other evidence presented in order to determine whether [they were]

harmless beyond a reasonable doubt." Id. at 307-08. "Structural defects" defy harm analysis because "they affect the framework within which the trial proceeds," and are not "simply an error in the trial process itself." Id. at 309-10. When the defendant unsuccessfully objects to a structural error, and the issue is raised on direct appeal, she is entitled to "automatic reversal" regardless of the error's actual effect on the outcome of the trial. Neder v. United States, 527 U.S. 1, 7 (1999).

Appellant need not prove specific prejudice to obtain reversal on direct appeal when improperly denied her Sixth Amendment right to a public trial. Waller v. Georgia, 467 U.S. 39, 49 (1984); cf. Weaver v. Massachusetts, 137 S.Ct. 1899, 1911 (2017) (defendant must show prejudice when denial of public trial raised within ineffective assistance of counsel claim in habeas corpus proceeding). Because appellant preserved this structural error by timely objecting in the district court, she is entitled to reversal of her convictions without a showing of harm. Id. at 1910.

## VI.   THE DISTRICT COURT ABUSED ITS DISCRETION BY IMPOSING A TWO-LEVEL SENTENCING ENHANCEMENT FOR CRIMINAL ACTIVITY THAT INVOLVED MORE THAN ONE BRIBE.

## A.    The Standard Of Review

This Court reviews legal conclusions or interpretations of the meaning of a sentencing guideline *de novo,* and it reviews findings of fact—including the relevant conduct for determining whether more than one bribe occurred—for clear error. United States v. Roussel, 705 F.3d 184, 197 (5th Cir. 2013). Clear error exists if the

Court has a definite and firm conviction that a mistake has been made.  Id.

## B.      The District Court Erred By Imposing An Enhancement Under U.S.S.G. § 2C1.1(b)(1).

The probation officer recommended a two-level enhancement under U.S.S.G. § 2C1.1(b)(1) because the offense involved more than one bribe (ROA.4859). Importantly, she admitted, "the exact number of bribes is unknown," but concluded, "it is clear that the offense involved more than one (1) bribe."  If the probation officer was referring to payments related to alleged campaign finance violations, those did not constitute bribes.  If the probation officer was referring to the Finish Line Academy investment (ROA.4849-51), the Telehealth venture (ROA.4849), and the AGM consulting venture (ROA.4853), that conduct constituted *attempted* bribes *at most*.  The only evidence of a completed bribe was the $10,000 for the film project. Appellant objected to this conclusion (ROA.4829-30).

The district court found that the enhancement applied because the Guidelines treat attempted bribes as "equivalent" to the underlying offense (ROA.3527).  It found that appellant's offense involved more than one bribe—the film project, helping Escobedo receive the contract from RHISD for tablets, the *iTutor* deal (aka the Finish Line Academy investment), and the telehealth program (ROA.3528).[7]  It

---

[7] The district court sustained appellant's separate objection to including in the total-benefit calculation the $10,000 payment that she discussed with Dr. Hussein regarding the telehealth program because he never made it (ROA.3532).  The court erred in including that conduct in the number-of-bribes calculation where it sustained the objection to it in the total-benefit calculation.

overruled appellant's objection to the two-level enhancement.

The district court erred by imposing this enhancement because the Government proved the payment of one bribe—$10,000 by the UC for the film project—in two installments. The remaining attempted bribes were speculative and never came to fruition. See Roussel, 705 F.3d at 199 (district court clearly erred in finding more than one bribe under § 2C1.1(b)(1) and applying two-level enhancement where Government proved payment of one bribe and remaining findings were based on speculative payments never made). Escobedo's tablet contract with RHISD did not yield any payments to appellant. Rather, third parties received funds that, at most, constituted campaign finance violations. The *iTutor*/Finish Line Academy deal never materialized in any contract with any school district. The district court rejected the telehealth project as a basis to increase the total-benefit calculation because it never came to fruition (ROA.3532), so there was no logical basis for the court to include it in the number-of-bribes calculation. That leaves the film project—the only "bribe" for the purpose of § 2C1.1(b)(1).

Accordingly, the district court erred in finding that the offense involved more than one bribe, and it should not have applied the two-level enhancement.

## VII. THE DISTRICT COURT ABUSED ITS DISCRETION BY IMPOSING A FOUR-LEVEL SENTENCING ENHANCEMENT BASED ON APPELLANT BEING AN ORGANIZER OR LEADER OF CRIMINAL ACTIVITY THAT INVOLVED FIVE OR MORE PARTICIPANTS OR WAS OTHERWISE EXTENSIVE.

### A.    The Standard Of Review

This Court reviews for clear error a sentencing enhancement for an aggravating role under U.S.S.G. § 3B1.1(a). United States v. Ayelotan, 917 F3d. 394, 406 (5th Cir. 2019). The preponderance of the evidence must show that the defendant was the organizer or leader of criminal activity that involved five or more participants or was otherwise extensive. Id. However, this Court reviews de novo whether the district court misinterpreted the term "otherwise extensive." United States v. Ho, 311 F.3d 589, 610 (5th Cir. 2002).

### B.    The District Court Erred By Imposing An Enhancement Under U.S.S.G. § 3B1.1(a).

The probation officer recommended a four-level enhancement under U.S.S.G. § 3B1.1(a) because appellant was an organizer and leader in criminal activity that involved five or more participants or was otherwise extensive (ROA.4859). Appellant objected to this enhancement (ROA.4835-37).

The district court found that the activity involved five or more participants or was otherwise extensive and that appellant coordinated the efforts of multiple people (ROA.3534-35). It found that there were "several individuals who would qualify as

participants," but neither the court nor the probation officer identified them. The court also found that any criminal activity involving multiple participants is an "organization" *per se*. It overruled appellant's objection to this enhancement.

A district court may increase the offense level by four if the defendant was an organizer or leader of criminal activity that involved five or more participants or was otherwise extensive. U.S.S.G. § 3B1.1(a). Alternatively, it may increase the offense level by two if the defendant was an organizer, leader, manager, or supervisor in any criminal activity that did not involve five or more participants or was not otherwise extensive. § 3B1.1(c).

A "participant" is a person who is criminally responsible for the offense and does not include an undercover police officer (or, by extension, a confidential informant). U.S.S.G. § 3B1.1, Cmt., n.1. Thus, neither Moreno nor the UC were "participants" under § 3B1.1. Criminal activity is "otherwise extensive" if it involves five or more people who "contributed to the success of the scheme." Ho, 311 F.3d at 611. Importantly, "otherwise extensive" refers to the number of people involved, not to the nature of the criminal organization. Id.

The district court clearly erred in applying this enhancement for several reasons. First, the activity did not involve five or more participants. Moreno and the UC do not count, and the court and probation officer did not identify any other participants. The Government identified only two other participants when it argued

during summation that appellant conspired with Adela Garza and Jaime Escobedo (ROA.3472-73). Second, the Government failed to prove that any participants (other than appellant) knowingly participated in criminal conduct and were criminally responsible. See United States v. Austin, 54 F.3d 394, 404-05 (7th Cir. 1995) (clear error to apply four-level enhancement under § 3B1.1(a) where Government failed to prove fraud involved five or more criminally responsible participants). Third, the court erred in finding that the activity was "organized" or otherwise extensive. Section 3B1.1 envisions an "organization"—not a defendant's distinct relationships with different people who are not members of the same organization. See § 3B1.1, Cmt., nn.2 & 3 (speaking of defendant's leadership role in "organization"); see also Cmt., n.4 & "Background" (which similarly speak of "association" and "enterprise"). This was not a "hub and spoke" operation. Even viewed in the light most favorable to the Government, appellant accepted or facilitated improper payments from different people in unrelated manners (with respect to how the payers were concerned). Her conduct was not extensive. She did not "organize" or "lead" any "organization," "association," or "enterprise." And in no event was the activity "otherwise extensive" under the meaning of § 3B1.1 and Ho.

The evidence did not establish that appellant was an organizer or leader or that the activity was otherwise extensive. Even if she played an aggravating role, the criminal activity did not involve five or more participants and was not otherwise

extensive, and the court should have enhanced by two levels instead of four. U.S.S.G. § 3B1.1(c). The court erred in applying this four-level enhancement.

## VIII. THE DISTRICT COURT ABUSED ITS DISCRETION BY FAILING TO APPLY A THREE-LEVEL DOWNWARD ADJUSTMENT BECAUSE APPELLANT DID NOT COMMIT ALL THE ACTS NECESSARY FOR THE SUCCESSFUL COMPLETION OF ALL THE SUBSTANTIVE OFFENSES.

### A.    The Standard Of Review

This Court reviews for clear error the refusal to apply a downward adjustment under U.S.S.G. § 2X1.1(b)(2). United States v. Soto, 819 F.3d 213, 216 (5th Cir. 2016). Determining whether a reduction under § 2X1.1(b) applies requires a fact-specific inquiry that "resists a precise standard." Id. at 217 (quoting United States v. Waskom, 179 F.3d 303, 308 (5th Cir. 1999)). This Court has identified four non-exhaustive considerations that inform application of this guideline: (1) the defendant's conduct in relation to the substantive offense; (2) whether the defendant has made "substantial progress" in the criminal endeavor; (3) whether the balance of the significant acts completed and those remaining tips toward completion of the substantive offense; and (4) the time frame of the scheme and the amount of time the defendant would have needed to finish the plan. Waskom, 179 F.3d at 308.

### B.    The District Court Erred In Failing To Apply A Downward Adjustment Under U.S.S.G. § 2X1.1(b)(2).

The probation officer proposed that appellant received **"or was to receive"** a total benefit of $56,000 (ROA.4856-57, 4859). The district court sustained in part

and overruled in part appellant's objection to the amount of the total benefit and applied a six-level increase of the offense level instead of a two-level increase based on a finding that the total benefit was $46,000 (ROA.3530-32). Appellant requested a three-level reduction in the offense level under U.S.S.G. § 2X1.1(b)(2) because she did not commit all the acts necessary for the successful completion of all the substantive offenses (ROA.4834-35). The court denied that request (ROA.3533).

In a conspiracy, the district court must decrease the offense level by three unless the defendant or a co-conspirator completed all the acts that the conspirators believed were necessary to complete the substantive offense successfully, or the circumstances demonstrate that they were about to complete all such acts but for apprehension or interruption by some similar event beyond their control. U.S.S.G. § 2X1.1(b)(2). The Commentary provides the following example: where the intended offense was the theft of $800,000 but the participants completed, or were about to complete only the acts necessary to steal $30,000, the offense level is the offense level for the theft of $800,000 minus three levels, or the offense level for the theft of $30,000, whichever is greater. Id. at Cmt., n.4.

Because the probation officer attributed, and the district court found, **intended** benefit to appellant, and that amount exceeded the actual benefit received, she *ipso facto* did not complete the substantive offense for which the district court assessed punishment. Had the court limited the total benefit calculation to the $10,000 that

appellant received for the film project, then § 2X1.1(b)(2) would not apply.  But the

decision to increase the offense level based on **intended** benefit instead of **actual**

benefit triggered application of this guideline.  Accordingly, the district court erred

in denying a three-level reduction in the offense level under § 2X1.1(b)(2).  See

United States v. John, 597 F.3d 263, 283-84 (5th Cir. 2010), abrogated on other

grounds by Van Buren v. United States, 141 S.Ct. 1648, 1653-54, n.2 (June 3, 2021)

(district court clearly erred in failing to apply three-level reduction where intended

amount of loss in fraud was $1,451,865 but actual loss was $78,750);[8] Waskom, 179

F.3d at 312 (clear error to deny three-level reduction where defendants failed to

complete acts believed necessary for substantive offense); Soto, 819 F.3d at 220

(same); United States v. Rodriguez-Leos, 953 F.3d 320, 330 (5th Cir. 2020) (same).

## IX.   THE DISTRICT COURT ERRED IN DENYING APPELLANT'S MOTION FOR A DOWNWARD VARIANCE AT SENTENCING UNDER 18 U.S.C. § 3553(a).

## A.   The Standard Of Review

When a defendant appeals the denial of a downward variance under 18 U.S.C.

§ 3553(a), this Court presumes that a properly calculated sentence within the

applicable guideline range is substantively reasonable.  United States v. Candia, 454

F.3d 468, 473 (5th Cir. 2006).  The defendant can rebut that presumption by showing

that the sentence does not account for a factor that should receive significant weight,

---

[8] John remains binding precedent in this Court on the § 2X1.1 issue.

gives significant weight to an irrelevant or improper factor, or represents a clear error of judgment in balancing sentencing factors.  <u>United States v. Nikonova</u>, 480 F.3d 371, 376 (5th Cir. 2007); <u>United States v. Scott</u>, 654 F.3d 552, 555 (5th Cir. 2011).

## B.    The District Court Erred In Denying Appellant's Motion For A Downward Variance Under 18 U.S.C. § 3553(a).

Appellant moved for a downward variance at sentencing under 18 U.S.C. § 3553(a) (ROA.4909-17).  She presented unrebutted evidence in support of her overwhelmingly positive background and good character and of a well-documented, lengthy mental illness—an anxiety disorder—that led to a gambling addiction that fueled her criminal conduct (ROA.3546-49, 4907-09, 4912-13, 4922-38, 4951-82).  She submitted voluminous medical records detailing a litany of health ailments and requested an alternative sentence (ROA.4914-16, 4983-5395).

Appellant emphasized the need to prevent a sentencing disparity in the treatment of similar offenders (ROA. 3553-54, 4916-17).  She highlighted the case of Rodolfo Delgado, a longtime elected state court judge in Edinburg, Texas, who was convicted of federal program bribery, conspiracy, and other related offenses for selling judicial rulings for cash.  <u>See</u> <u>United States v. Delgado</u>, No. 4:18-cr-00115 (S.D. Tex.), <u>aff'd</u>, 984 F.3d 435 (5th Cir. Jan. 5, 2021).  Sworn to uphold and enforce the law, he debased the entire justice system and undermined public confidence in the judiciary as a whole.  A court in the Southern District of Texas found that the total value of the benefits related to the bribes was $45,500—only $500 less than the

total benefits attributed to appellant's conduct—and sentenced him to **60 months** in prison in 2019, not long before appellant's trial and sentencing. Appellant argued that it would be unreasonable under § 3553(a) to impose a longer sentence on her than Delgado received for substantially more offensive conduct (ROA.4917):

> It would be unfair to impose a lengthy sentence on [appellant] when an elected judge receives five years for literally selling rulings from the bench. The law cannot tolerate that kind of disparate treatment. [Appellant]'s conviction warrants a sentence much less than Delgado's. She was not elected and sworn to administer justice. Her conduct did not result in the debasement of the entire justice system. In short, Delgado's crimes were much worse than [appellant]'s, so her sentence should be much less than his.

The district court found that the seriousness of the crimes and the need to promote respect for the law, provide just punishment, and deter criminal conduct weighed in favor of a strict sentence (ROA.3563). It found that appellant's low threat of harm to the public and substantial community service weighed in favor of a lenient sentence (ROA.3564). It denied a variance (ROA.3565).

The sentence is substantively unreasonable because it does not account for factors that should receive significant weight, and it represents a clear error of judgment in balancing sentencing factors. The court completely ignored appellant's medical issues when considering the need for the sentence to provide her with medical care in the most effective manner. See 18 U.S.C. § 3553(a)(2)(D). The court did not consider the kinds of alternate sentences available when determining

that a lengthy prison sentence was sufficient but not greater than necessary, especially considering that appellant is a middle-aged, non-violent offender with no prior criminal history. 18 U.S.C. § 3553(a)(3). Most important, the court utterly failed to consider the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. 18 U.S.C. § 3553(a)(6). This last omission was unreasonable given the amount of emphasis appellant placed on that factor in light of Judge Delgado's case. A school official who profits from a fictitious sting operation that does not cause actual monetary loss to a victim should not receive a sentence 20 months longer than a judge who sells judicial rulings for cash. That sentence disparity is unwarranted.

The district court's failure to balance the statutory sentencing factors reasonably is highlighted by its alternate findings. The court initially found that neither a downward nor an upward variance was appropriate and assessed an 80-month sentence (ROA.3565). In its next breath, the court found that, had it granted the Government's request for a four-level enhancement under § 2C1.1(b)(3), producing a higher guideline range, it would have varied downward to impose 80 months (ROA.3565-66). It also found that, had it sustained appellant's objections, producing a lower guideline range, it would have varied upward to impose 80 months (ROA.3566). These findings, clever though they may be, demonstrate that the court did not give adequate consideration to the § 3553(a) sentencing factors and

manipulated its findings to yield an 80-month sentence no matter what the factors required. This reverse-engineered, result-oriented process represents a clear error of judgment in balancing the sentencing factors. <u>See</u> <u>Nikonova</u>, 480 F.3d at 376. Accordingly, the district court imposed a substantively unreasonable sentence and erred in denying appellant's motion for a downward variance.

## **<u>CONCLUSION</u>**

Appellant respectfully requests that the Court issue an appellate acquittal, reverse the convictions and remand for a new trial, or vacate the sentences and remand for a new sentencing hearing.

Respectfully submitted,

*/s/ Randy Schaffer*

Randy Schaffer, P.C.
State Bar No. 17724500
noguilt@schafferfirm.com

*/s/ Josh Schaffer*

Josh Schaffer
State Bar No. 24037439
josh@joshschafferlaw.com

1021 Main, Suite 1440
Houston, TX 77002
(713) 951-9555
(713) 951-9854 (facsimile)

Attorneys for Appellant
SYLVIA P. ATKINSON

## **CERTIFICATE OF SERVICE**

We electronically filed this document with the clerk of the United States Court of Appeals for the Fifth Circuit on November 12, 2021, using the electronic case-filing system of the court.  That system sent a "Notice of Electronic Filing" to Carmen Castillo Mitchell, assistant united states attorney, 1100 Louisiana Street, Suite 2300, Houston, Texas, 77002, a registered user of the system who consented in writing to accept this notice as service of this document by electronic means.

*/s/ Randy Schaffer*
Randy Schaffer

*/s/ Josh Schaffer*
Josh Schaffer

## **CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B), as it contains 12,737 words, excluding the portions exempted by Rule 32(f).  It complies with the typeface requirements of Rule 32(a)(5) and the typestyle requirements of Rule 32(a)(6), as it has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point typeface.

*/s/ Randy Schaffer*
Randy Schaffer

*/s/ Josh Schaffer*
Josh Schaffer